IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

AMERICAN INDEMNITY COMPANY, )
)
    Plaintiff, )
)
v. ) CIVIL ACTION NO. 99-PWG-2284-NW
)
NANCY TROUSDALE, ET AL., )
)
    Defendants. )

**ENTERED**
**APR 0 1 2004**

MEMORANDUM OF OPINION

On January 29, 2002, the undersigned concluded that American Indemnity had a duty to defend and breached this duty but further stated "the breach of such a duty does not estop American Indemnity from challenging coverage of the claims," citing *Alabama Hospital Association Trust v. Mutual Assurance Society of Alabama*, 538 So.2d 1209, 1216 (Ala. 1989). (Doc. #72). The parties were then given another briefing scheduling to address the issue of coverage. American Indemnity, Hardie and the Bentleys have filed motions for summary judgment.[1]

I. American Indemnity's Motion for Summary Judgment
  (Doc. #82)

American Indemnity argues that there is no coverage because under Alabama law, the economic losses incurred by Hardie and Bentley are intangible property losses that are not covered by the policy; emotional distress stemming from an economic loss is not an occurrence and therefore is not covered under the policy; the policy's "expected" or "intended" exclusion applies to Trousdale's wilful conduct regarding the guaranteed investment return of advance special event tickets.

---

[1] The parties and attorneys in this action have been called upon to address unique issues in the context of very unusual facts. They are to be commended for their efforts to identify the issue to be resolved and the principles which guide that decision.

    (A)    Whether, under Alabama law, the economic losses incurred by Hardie and Bentley are <u>intangible property losses that are not covered by the policy</u>

The policy provides:

> b.     This insurance applies to "bodily injury" and "property damage" only if:
>
>> (1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
>>
>> (2)     The "bodily injury" or "property damage" occurs during the policy period.
>>
>> ....

Section V governing definitions states:

> 3.     "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
>
> 15.     "Property damage" means:
>
>> a.     Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>>
>> b.     Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Doc. #83, exhibit A).

In *American States Insurance Company v. Martin*, 662 So.2d 245 (Ala. 1995), the Alabama Supreme Court held:

> [T]angible property (like real estate) is property that is capable of being handled, touched or physically

2

> possessed. Purely economic losses are not included in this definition.
>
> ....
>
> [Strictly economic losses, like lost profits, loss of an anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to "tangible" property.

662 So.2d 248-49.

Neither Hardie nor the Bentleys have argued in their motions for summary judgment currently before the court that economic losses are covered under the policy. Rather, they refer to the amount of the economic loss as a reference point to argue that the settlement amounts reflected reasonable damages for mental anguish.

American Indemnity is entitled to summary judgment to the extent that the economic losses of Hardie and the Bentleys are not covered under the policy.

    (B)    Whether emotional distress "stemming from" and "incidental to" an economic loss is not an "occurrence," and therefore is not covered under the policy

The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same harmful conditions. In the first Memorandum of Opinion entered in this action, the court stated:

> American Indemnity further argues that there is no occurrence/accident under the policy and thus no duty to defend based on Trousdale's alleged intentional deception. This contention overlooks the fact that Hardie's complaint alleged not only intentional deception but also negligent, reckless, and mistaken representations. The Alabama Supreme Court has held "that the term 'accident' does not exclude human fault called negligence." *U.S. Fidelity and Guaranty Co. v. Armstrong*, 479 So.2d 1164, 1167 (Ala. 1985); *L. J. Moss v. Champion Insurance Co.*, 442 So.2d 26, 28 (Ala. 1983); *U.S. Fidelity and Guaranty Co. v.*

3

> *Bonitz Insulation Co. of Alabama*, 424 So.2d 569, 571 (Ala. 1982); *Employers Ins. Co. of Ala., Inc. v. Ala. Roofing and Siding Co., Inc.*, 271 Ala. 394, 396, 124 So.2d 261, 262 (!960); *Employers Ins. Co. of Ala., Inc. v. Rives*, 264 Ala. 310, 312, 87 So.2d 653, 655 (1955). Likewise, negligent or reckless misrepresentations of material facts constitute "occurrences" under policies defining occurrence as an accident. *Townsend Ford, Inc. v. Auto-Owners Ins. Co.*, 656 So.2d 360, 365 (Ala. 1995). (Insurer was required under policy to defend on reckless misrepresentation claim); *Universal Underwriters Ins. Co. v. Youngblood*, 549 So.2d 76, 78 (Ala. 1989) ("The negligence claims and the innocent or reckless aspects of the misrepresentation claims present a sufficient basis to support the trial court's declaration of a duty to defend.") *American States Insurance Company v. Cooper*, 518 So.2d 708 (Ala. 1987).

(Doc. #72, p.11).

In the present motion for summary judgment, American Indemnity argues:

> Alabama courts have not had the occasion to address whether economic losses due to an insured's misconduct involving investment securities constitutes an "occurrence." Courts interpreting similar policies for similar claims against insureds have determined that emotional distress incidental to economic losses is not covered.

(Doc. #83, p. 8).

American Indemnity has cited authority from the state courts of New York and California and from the United States Court of Appeals for the Ninth Circuit in support of its argument. Significantly, American Indemnity has not directed this court to a case from an Alabama appellate court.

While the Alabama courts have not had the occasion to address whether emotional distress incidental to economic losses due to an insured's misconduct involving investment securities

4

constitutes an "occurrence," the Alabama Supreme Court has decided this issue in the context of real estate investments.

In *American States Insurance Co. v. Cooper*, 518 So.2d 708 (Ala. 1987), the court held that mental anguish was a bodily injury and that reliance on recklessly or innocently made misrepresentations which resulted in mental anguish was covered as an occurrence and further held that the insurance company was required to defend the plaintiffs and to indemnify them except for intentional misrepresentations.

In *American States Insurance Co. v. Martin*, 662 So.2d 245 (Ala. 1995), another real estate investment loss case, the court held "strictly economic losses like lost profits, loss of an anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to 'tangible' property." The court went on to consider whether the damages request for mental anguish would trigger insurance policy coverage for "bodily injury" and concluded that there was no coverage only because the mental anguish injury occurred after the expiration of the policy.

There is no compelling reason to conclude that the Alabama Supreme Court would hold differently in this case.[2/] Because Hardie and the Bentleys have included allegations that the misrepresentations made by Trousdale were made negligently, recklessly, and mistakenly, this court concludes that the resulting mental anguish is within the scope of the coverage, and therefore, American Indemnity is not entitled to summary judgment with respect to this issue.

---

[2/]   See also, *Vigna v. Allstate Ins. Co.*, 686 A.2d 598 (Me. 1996).

> (C) Whether the policy's "expected" or "intended" exclusion applies to Trousdale's wilful conduct regarding the guaranteed <u>investment return of advance special event tickets</u>

American Indemnity argues that Trousdale's conduct as alleged in the complaint falls within the policy's intentional acts exclusion which provides:

> This insurance does not apply to:
>
> a. Expected or Intended Injury
>
> "Bodily injury" or "property damages" expected or intended from the stand point of the insured.

American Indemnity further points out that Trousdale was indicted for and pled guilty to failure to register as an agent before selling "securities" consisting of investment contracts in the travel ticket venture and wilfully and unlawfully employing a scheme to defraud persons by knowingly inducing the sale of securities by issuing checks in the amount of the principle plus profit.

American Indemnity cites *Hooper v. Allstate Insurance Company*, 571 So.2d 1001, 1002-03 (Ala. 1990) for the proposition that no public policy consideration dictates that an insurer must indemnify a third party for criminal acts of an insured. This proposition must be viewed in light of the case before the Alabama Supreme Court. In *Hooper*, the policy specifically excluded coverage for "any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person." The third party argued that the exclusion contravened public policy or was unconscionable. In response, the Alabama Supreme Court held:

> As we noted earlier, insurance companies have the right to limit their liability and to write policies with narrow coverage....No public policy considerations dictate that an insurer must indemnify a third party for the criminal acts of an insured. Similarly, Hooper's

6

> claim that the exclusion is unconscionable is not well taken.
>
> Because the exclusion unambiguously excluded coverage for injury or damage that might reasonably be expected to result from criminal acts by an insured, without a requirement that the acts be intentional or that the injury be intended, and because Mize's [the insured's] action fell squarely within that exclusion, Allstate was under no duty to defend Mize or indemnify Hooper for his injuries.

571 So.2d at 1003. In the case before this court, there is no "criminal act" exclusion. *Hooper* is not persuasive.

The complaint alleged not only intentional deception but also negligent, reckless, and mistaken representations. Because this case settled rather than being tried, no one knows exactly what the evidence would have shown. Based on the allegations within the complaint, the court concludes that it is at least possible that a fact finder could reasonably find that Trousdale's assertion that investors would double their investments in one or two months and her issuance of post-dated checks reflecting the anticipated return was not an intentional misrepresentation but rather an overly optimistic prediction concerning the venture. In the first memorandum of opinion filed in this action, the court concluded "Because the duty to defend arose in August, 1999 and Trousdale was not indicted until April 2000 after settling the underlying action [on or about March 3, 2000], the subsequent guilty plea could not retroactively relieve American Indemnity of its duty to defend." (Doc. #72, p. 11). Had this case gone to trial and had Trousdale pled guilty prior to the civil trial, Trousdale would have had an opportunity to explain the circumstances of her decision to plead guilty to the trier of fact, and the trier of fact could then determine what weight should be given to the evidence. See *Durham v. Farabee*, 481 So.2d 885, 887 (Ala. 1985). Further, if the judgment

of conviction had been on appeal at the time of the civil trial, the conviction could not have been admitted as substantive evidence. *Cups Coal Co., Inc. v. Tennessee River Pulp & Paper Company*, 519 So.2d 932 (Ala. 1988). The fact of the matter, however, is that this case did not go to trial but instead settled and settled prior to the guilty plea. Therefore, this court has before it only the facts alleged in the complaint and the exhibits submitted by the parties. In deposition, Hardie was questioned:

> Q. ...Mr. Beard has referred to what Mr. Trowbridge and Ms. Trousdale were involved in which these investments as a scheme. Did you ever view their taking of your money as an investment as being some kind of scheme to get your money away from you for ill purposes?
>
> A. No. I had no reason to.

(Hardie depo, p. 99).

In her affidavit, Trousdale stated:

> 4. During my dealings with Mr. Hardie, and with Mr. and Mrs. Bentley, I did not expect or intend for them to lose money or be injured as to the investments they made which formed the basis of the civil actions they filed against me.

(Trousdale affidavit, p. 2).

Based on the affidavit of the Trousdale and deposition of Hardie, the court concludes that the mental anguish was neither expected or intended, and, therefore, American Indemnity is not entitled to summary judgment on this issue.

American Indemnity further argues that the policy was intended to cover business transactions involved in "bus tours" rather than security transactions. The court cannot find as a matter of law that Trousdale's conduct with respect to the advance special event tickets did not

involve "bus tours." Indeed, it seems that the event tickets and bus transportation to those events would be integrally related. The court cannot hold, based on the record before it, that by encouraging others to participate in the purchase of the advance event tickets, Trousdale removed the transactions from the realm of "bus tours" and placed it within the realm of security transactions and thus outside the area of anticipated coverage.

II. Trousdale's Motion for Clarification
   (Doc. #80)

Trousdale argues that in its earlier opinion this court in effect granted partial summary judgment in favor of Trousdale with respect to the breach of contract claim. She argues that the issues remaining for jury determination would be the issue of damages for said breach of contract, and the issue of bad faith. Hardie and the Bentleys argue that the settlement agreements contained an assignment of all rights Trousdale had against American Indemnity. In response, Trousdale argues that the assignments by her to Hardie and the Bentleys was "of 'an interest' in all claims, not an assignment of 'all interest' in all claims that Nancy Trousdale, et al had against American Indemnity Company, and would thus constitute a partial assignment." (Doc. #111, p.2). The agreements both to Hardie and to the Bentleys are entitled "Settlement Agreement and Assignment" and specifically state:

> In consideration of the aforesaid settlement, Nancy's Tours, Nancy Trousdale, Individually and d/b/a Nancy's Tours, Robert N. Trousdale et al, assigns to Sam U. Hardie, Jr. [and Gary and Gwen Bentley], an interest in all claims that said assignors may have against American Indemnity Company that are legally assignable as defendants interest may appear, not to exceed the amount of the said judgment, plus attorneys fees, interest, and costs.

9

> It is understood and agreed that this assignment relates only to an assignment to Sam U. Hardie, Jr. [and Gary and Gwen Bentley], and no other person or entity. All other rights in any policy or insurance policies written by American Indemnity Company that the defendants have in said policies remain intact.

The settlement agreements contained an assignment of all rights Trousdale had against American Indemnity based on the litigation involving Hardie and the Bentleys. Any interpretation allowing Trousdale to both assign and retain claims against American Indemnity based on the Hardie/Bentleys litigation would mean that Trousdale in effect gave up nothing in consideration for the settlement agreement. Had other individuals sued and not settled with Trousdale, Trousdale would have had a cause of action for breach of contract and bad faith against American Indemnity with respect to claims that American Indemnity denied defense with respect to claims filed by the other individuals.

II. Hardie's and the Bentleys' Motions for Summary Judgment
    (Doc. #81 and Doc. #84)

Hardie and the Bentleys allege that they are entitled to summary judgment by virtue of American Indemnity's failure to defend and the settlement agreements and consent judgments. In *Stone Building Company v. Star Electrical Contractors, Inc.*, 796 So.2d 1076 (Ala. 2000), The Alabama Supreme Court stated:

> ... The general rule is that, "if notice of either the original suit or of the settlement by the indemnitee," then the indemnitee has the burden of establishing that it was actually liable to the plaintiff and that the settlement was a reasonable one. *Watts v. Talladega Fed. Sav. & Loan Ass'n*, 445 So.2d 316, 320 (Ala. Civ. App. 1984). However, if the indemnitor has been given notice of the action against the indemnitee and has been given an opportunity to defend or to settle the action, then the indemnitor "is precluded from contesting the indemnitee's liability in a subsequent indemnity or third-party action." *Id.*

10

> "Indemnity against losses for which the indemnitee is not liable to a third person, and which the indemnitee improperly pays. A person legally liable for damages who is entitled to indemnity may settle the claim and recover over against the indemnitor, even though he has not been compelled by judgment to pay the loss. In order to recover, the indemnitee settling the claim must show that the indemnitor was legally liable, and that the settlement was reasonable. *In the event that an indemnitor is not afforded the alternative of participating in a settlement or conducting the defense against the original claim, an indemnitee settling the claim will have the burden of establishing actual liability to the original plaintiff rather than the lesser burden of showing potential liability.*
>
> "However, *when the indemnitor has notice of the claim and refuses to defend, the indemnitor is bound by any good faith reasonable settlement, and the indemnitee need only show potential liability.*
>
> "Practice guide: A practical device by which *an indemnitee can* protect against the awkward possibility of having to prove the original plaintiff's case against himself, the original defendant, is to *offer the indemnitor before any settlement is concluded the choice of (1) approving the settlement or (2) taking over the defense of the case and agreeing to hold the indemnitee harmless in any event for damages which may be assessed against him excess of the amount of the proposed settlement*. If the indemnitor approves the settlement or defends unsuccessfully against the original claim, the indemnitor cannot later question the indemnitee's liability to the original claimant. *If the indemnitor declines to take either course, then the indemnitee will only be required to show potential liability to the original plaintiff in order to support his claim over against the indemnitor.*"
>
> 41 Am.Jur.2d *Indemnity* § 46 (1995) (footnotes omitted).

796 So.2d at 1090.

Subsequent to the submission of the various motions for summary judgment currently before the court, the Alabama Supreme Court decided *Liberty Mutual Insurance Company v. Wheelwright Trucking Co., Inc.*, 851 So.2d 466 (Ala. 2002). The court cited *Stone Building* when holding:

> The insurers in this case had both the right and the opportunity to provide Dorsey with a defense; they declined to do so. We conclude that under the circumstances of this case, the insurers are bound by Dorsey's consent judgment settling Wheelwright's claims to the extent that the consent judgment was reasonable and entered into in good faith.

The Alabama Supreme Court rejected an argument by the insurers that the consent judgment was "per se" collusive pointing out that the insurers were informed of the consent settlement and its terms before its approval, the record supports the settlement amount, the facts permitted an inference that the insurers consented to the terms of consent judgment. The Alabama Supreme Court agreed with the circuit court that the insurers were precluded under the facts of the case from challenging the validity or amount of the consent judgment.

In the case before this court, American Indemnity was advised of the Hardie's complaint and amended complaint prior to the settlement agreement and consent judgment but was unaware of the settlement agreements and their terms until after the consent judgment. The court has not been provided with a copy of a state court record indicating that the trial court considered evidence and determined whether based on the evidence the settlement amount was appropriate. Further, there was no consent on the part of American Indemnity to consent judgment. Despite the factual differences between this case and *Wheelwright*, this court is satisfied that Alabama law does not require prior notice of a settlement agreement or consent judgment *if* the insurer had timely notice of the complaint and amended complaint as American Indemnity did in this case.

American Indemnity argues that the amount of the consent judgments supports the notion that they were the result of collusion since the Bentleys lost $138,000 but obtained a consent judgment in the amount of $300,000 and Hardie invested $45,000 but obtained a consent judgment in the amount of $125,000. American Indemnity points out that following Trousdale's guilty plea, the court found the amounts of restitution owed to the Bentleys and Hardie to be substantially less that the amounts of the consent judgments. In the criminal case, the court indicated the restitution amount owed to Bentley to be $113,000 and the restitution amount owed to Hardie to be $25,000. Presumably the restitution amount in the criminal case was based solely on economic loss with no provision for compensatory damages for mental anguish. The amount of damages provided for in the consent judgments had to be based solely on compensatory damages for mental anguish with no provision for economic loss.

This court cannot find that the settlement amounts were unreasonable. Alabama law does not provide a fixed formula for determining the compensatory damages for mental anguish; rather, these damages are within the jury's discretion subject to review only for a clear abuse of discretion. See, *Southern Pine Electric Cooperative v. Burch*, ___ So.2d. ___, 2003 W.L. 22418057 (Ala. Oct. 24, 2003); *Horton Homes, Inc. v. Brooks* 832 So.2d 44 (Ala. 2001).

Hardie testified in deposition:

A.  I lost sleep for – I lost sleep for many, many nights after this came out in the paper. I lost credibility with my wife. I have never seen her that mad at me before when she – when I had to tell her that, you know, that I had – that that was me included in that group. I lost credibility with friends and lost, I am afraid, credibility – when it came out that a preacher was involved and it was my son, I'm afraid I lost credibility for him. And he – it came out in the paper that there were, you know, insurance – they named the occupations and said there was a preacher involved. And by that time, word had leaked out somewhere that I was the insurance person and that the preacher was my son.

13

Q:     Had the paper described you all by profession or something and not by name?

A:     That's what they – the paper put a whole lot of professions in there. And then down at the end, I believe, they put, you know, and also a preacher. And so that, you know, everybody connected the two of us together. And then – and he had – he even had – he even had some of his congregation come to him, you know, about that. And that caused me – you know, when something happens to your son, that caused me an awful lot of anguish during that period of time.

. . . .

Q:     Can you think of any other emotional distress or anxiety that you suffered that was related to this episode?

A:     Well, the fact that I had money one day and then the next it was gone was – and money that I had hopefully planned on helping my grandchildren with their – in their college education, and it was gone. And that certainly caused me great concern and anguish.

Q:     Are you telling me now that you don't have any money to help with your grandchildren's education?

A:     No. I didn't – I'm not say – well, I don't have that money, I will say.

Q:     But you do have some money that you can help with –

A:     I don't know whether I can or not.

. . . .

Q:     What physical symptoms did you have as a result of your anxiety and emotional distress that you claim resulted form this debacle.

A:     Well, one thing, I was angry as a hornet at home, and I very likely was at the office. I don't know. That's kind of hard for you to – you know.

Q:     You are not telling me that's the only time you have been angry at home, are you?

A:     No, I'm not. But my wife, you know, knew something was wrong with me even before she learned about this, see.

Q:     She didn't know anything about the investments until after it came out in the paper?

A:     No, until the thing came out in the paper. And then I told her.

14

Q: Do you generally handle the financial end of your family?

A: Yes.

Q: Any other physical symptoms of your distress besides your anger?

A: Well, as I said, I couldn't sleep.

. . . .

Q: Let me ask you just a couple of general questions, and then I think I'm finished. Once it was discovered that there was no money, did you experience any embarrassment for you personally as a result of how this all worked out?

A: Well, certainly I did. I was – you know, any time that you have been, you know, a businessman, it's discovered that he has been taken, it's got to be terribly embarrassing.

Q: How did that affect your relationship with your close friends in the Florence community, if it did at all?

A: Well, the main thing was the way that they laughed at me and, you know, saying "I didn't know you were that big a sucker" or just degrading me in many ways because of the fact I had been taken.

Q: You mentioned something about your son and your feelings about his involvement as a pastor in that area and got in the papers and so on. Why did you feel as much anguish about that particular situation when this all came out?

A: Well, the reason is, as you know, Jim, my children and our family means more to me than my own being. And I felt like that I had been responsible for my son having this publicity in his church. And I felt that that would put him through embarrassing times that he did not deserve to have [been] put through. And they did not know – it didn't say in there that I had invested for the preacher or anything like that. So it was just – that was really the very fact that I was putting him through that.

(Hardie depo, pp. 70-75, 103-04.).

Gary Bentley testified in deposition:

A: It was a very devastating loss. It was a large loss, physically, mentally, financially.

Q: How was it a mental loss to you?

15

A:  Because I borrowed a lot of the money against assets to invest in that, and then all at once, you go form, like I said before, you know–

Q:  What assets did you borrow against?

A:  Is this relevant?

Q:  Yes, I think so. I mean, you're alleging –

MR. POTTS:  I think, Gary, it's relevant to the extent to actually shows that your losses were in excess of your $138,000. If I understand it – and this may help with your line of questioning, I think I understand again where you're going and why you're asking these questions – he leveraged assets that were unencumbered, and when his loans came due, he had to sell his assets at a reduced price to cover his loans, which really added to his $138,000 loss. Am I correct, Gary?

THE WITNESS:  Yes, plus interest.

Q:  (BY MR. BEARD)  And that's where I'm going Mr. Bentley.

A:  And I don't mind answering the question. It's just not something I've thought about, and I'm having to think. I mean, I remember losing the money, and I remember how devastating it was.

I borrowed some against my cars, I borrowed some against my house, I borrowed some against my shell inventory, which is what Mr. Potts is referring to that I ended up having to turn around and sell at a reduced price to pay off these loans.

Of course, it's like anything else, if you have to sell in a hurry or buy in a hurry, you usually lose.

MR. POTTS:  I believe you mentioned the interest on the loans that you had as well.

THE WITNESS:  Yes.

MR. POTTS:  Scott, if you don't mind me asking him, do you have any estimate, Gary, as to how much additional loss, indirect loss I guess we could call it, that you've suffered over and above your actual $138,000 principal?

THE WITNESS:  Well, I remember thinking after I got to the point I could think that in actuality that it probably cost me over $200,000.

16

Q: (BY MR. BEARD): Okay. How else did it upset you emotionally and mentally?

A: Well, I went to the doctor after all this come out, because I got to where when you lay down in bed at night and you can't go to sleep for thinking about it and you wake up thinking about it, it just consumes your life to the point that everything else seems irrelevant.

. . . .

Q: And what did you see him for? What symptoms did you described to him and tell him?

A: Stress. I told him I just feel terrible all the time, you know, I don't feel like eating, I don't feel like – I'm exhausted, but I can't sleep, and when I do sleep, it's not – you know, I don't feel rested once I got up.

Q: What did he do for you?

A: He asked me did I have any stress in my life at that time. And I said, "Well, I lost $138,000 with Nancy's Tours," and he said, "Well, that will stress anybody."

I got to the point, you know, I couldn't enjoy like with my children, because you're so subconsciously consumed with this that you can't – you know, you try to think and be patient with the children and your wife. And Gwen and I were struggling to get through this thing together. Regardless of your financial situation, when you take that kind of chunk of money out of your income, it's that's no longer available, you know, your lifestyle changes.

And I realize I'm a young man at this age, but that's still a devastating loss; and mentally and physically, it was just I never suffered anything like that before, and it was very hard to deal with. And Gwen, my wife, was dealing with the same thing. And sometimes when there's two of your there, it's hard – when both of you are dealing with the stress and pain, its's hard to, your know, be patient with her and understanding, because you're dealing with your own situation.

And – and it's very – you know, I know people will say that physically that it doesn't affect you; but physically, it does, because the only thing I can tell you is it just feel[s] like you haven't slept for days, I mean, you just feel that way all the time.

(Bentley depo., pp.96-92),

In light of the above deposition testimony of Hardie and Gary Bentley and the fact that mental anguish damages generally rests within the discretion of the jury, the court cannot conclude

that the settlement amounts of $125,000 and $300,000 were unreasonable. The court concludes that the motions for summary judgment filed by Hardie (doc. #81) and the Bentleys (doc. #84) are due to be GRANTED.

Based on the foregoing, American Indemnity's motion for summary judgment (doc. #82) is due to be GRANTED to the extent the economic losses are not covered under the policy but DENIED in all other respects. Trousdale's Motion to Clarify (doc. #80) is GRANTED to the extent the court concludes that the settlement agreements contained an assignment of all rights Trousdale had against American Indemnity on the litigation involving Hardie and the Bentleys. The court concludes that the motions for summary judgment filed by Hardie (doc. #81) and the Bentleys (doc. #84) are due to be GRANTED. A separate Final Judgment consistent with the Memorandum of Opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 31st day of March, 2004.

PAUL W. GREENE
CHIEF MAGISTRATE JUDGE